[Civ. No. 13793. Third Dist. July 1, 1976.]

A. H. ROBINS COMPANY, INCORPORATED,
Plaintiff and Respondent, v.
DEPARTMENT OF HEALTH et al., Defendants and Appellants.

## COUNSEL

Landels, Ripley & Diamond, Edgar B. Washburn, Mary Beth Uitti and Fredrick M. Wooster for Plaintiff and Respondent.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, John Fourt, N. Eugene Hill, Edmund E. White and Byron B. Chell, Deputy Attorneys General, for Defendants and Appellants.

## Opinion

CARTER, J.*—This is an appeal from a judgment granting plaintiff A. H. Robins Company, Incorporated, a corporation (hereinafter "Robins"), a peremptory writ of mandamus commanding the Director of Health Care Services (then Earl W. Brian, M.D.) to set aside his decision dated June 15, 1970, which found Robins to be in violation of Welfare and Institutions Code section 14053.5. The judgment also dismissed, without prejudice, Robins' initial complaint for declaratory and injunctive relief.

In general, Welfare and Institutions Code section 14053.5 is designed to halt the state's purchase of drugs under the Medi-Cal program when a drug manufacturer has indulged in discriminatory marketing practices. The offending marketing practices are specifically described in this statute, the full text of which, as amended in 1971, we append in the margin.[1]

On August 26, 1969, Robins filed a complaint for declaratory and injunctive relief against defendants (action No. 195213), challenging the constitutionality of the application of section 14053.5 to Robins' business practices. As a result of that action, the parties stipulated to a hearing in accordance with the Administrative Procedure Act. The hearing officer specifically found that Robins' marketing practices resulted in price

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

[1] Section 14053.5: "For the purposes of the Medi-Cal Act, the terms 'prescribed drug' and 'prescription drug' shall not include any drug which, because of differing prices charged by the manufacturer on a discriminatory basis or discriminatory refusal to sell by the manufacturer, or both, is not available on the same terms and conditions to all providers of prescription services, or any drug which is found to be overpriced in comparison to another drug which has an equivalent therapeutic effect, unless the director determines that the drug is vital to the program and no acceptable substitute is available.

"Before the director determines that any drug has an equivalent therapeutic effect in comparison to another drug, or is vital to the program and no acceptable substitute is available, he must have received a report to that effect from the Medical Therapeutics and Drug Advisory Committee.

"Nothing in this section shall be construed to apply to quantity or other nondiscriminatory discounts available on the same terms and conditions to all providers of prescription services, to sales by competitive bidding to federal, state or local governmental agencies, or to sales to wholesalers so long as the manufacturer does not require or induce the wholesalers to make the drug available other than on the same terms and conditions to all providers of prescription services.

"This section shall not be construed to deny reimbursement to hospitals for prescribed drugs furnished to inpatients or, unless the regulations provide to the contrary, to registered outpatients."

discrimination between, and discriminatory refusal to sell to, providers of prescription services, and declared that Robins' drug products were accordingly not eligible for the California Medical Assistance Program.

Thereafter Robins filed a new action (No. 203631) in order to obtain judicial review of the administrative decision. The two cases were consolidated by the trial court and the state was enjoined from removing Robins' products from the Medi-Cal Drug Formulary pending final judicial determination.

Thereafter, upon application of the state, we issued a writ of prohibition restraining the trial court from enforcing an order granting post-administrative discovery to Robins and placed the litigation in a posture for trial court review of the administrative decision. (See *State of California* v. *Superior Court* (1971) 16 Cal.App.3d 87 [93 Cal.Rptr. 663].)

Following extensive briefing by the parties, the trial court found that the term "discriminatory" as used in section 14053.5 means unreasonable, unfair and arbitrary, and that Robins' marketing practices did not violate the terms of section 14053.5.

■ Where the "independent judgment on the evidence" rule fixes the scope of the superior court's administrative review, the appellate court's factual inquiry is limited to ascertaining whether the findings of the superior court are supported by substantial evidence. When, in contrast, the evidence is undisputed, the superior court's review represents an inquiry of law (not one of fact) and the appellate court's inquiry is not circumscribed by the substantial evidence rule. (*David Kikkert & Associates, Inc.* v. *Shine* (1970) 6 Cal.App.3d 112, 116 [86 Cal.Rptr. 161].) Here there is no dispute concerning Robins' marketing and pricing practices.

The undisputed facts establish that Robins is a pharmaceutical company whose main business is the development, promotion and sale of pharmaceutical products, 10 of which are listed in the California Medical Assistance Program formulary. The physical distribution of Robins' drug products is made from warehouses located in Richmond, Virginia; Los Angeles, California; Chicago, Illinois; and Dallas, Texas. Robins publishes a "list price" for its drug products, including the 10 drugs listed in the administrative accusation which the state seeks to have removed from the California Medical Assistance Program.

Such list prescribes the price which the drug wholesaler uses to sell Robins' products, subject to a 2 percent cash discount. Robins discontinued direct sales to community retail pharmacists, physicians and dentists in private practice in December of 1952. In addition, Robins discontinued direct sales to proprietary hospitals in January of 1969. Prior to this latter date, proprietary hospitals, by making direct purchases, were allowed a discount of 20 percent from the list price in addition to a 2 percent discount for payment within 30 days. Thus since 1952, community retail pharmacists, physicians and dentists in private practice have been able to obtain Robins' drug products only from drug wholesalers. Such wholesalers have also been the only source of Robins' products for proprietary hospitals since December of 1968. Robins sells its drug products directly to drug wholesalers at list price less a 16⅔ percent discount, and allows an additional 2 percent discount for cash. In the case of narcotics, the wholesaler is given a discount of 20 percent off list price.

The multiple pricing structure of Robins' products provides that nonprofit general hospitals and affiliated nursing homes, federal, state and local governments may buy the 10 challenged specified pharmaceutical products at a 20 percent discount below list price by direct purchase from Robins. It is undisputed that community retail pharmacists, proprietary general hospitals, proprietary nursing homes, and individual providers of prescription services such as physicians and dentists may only purchase the 10 pharmaceutical products through a wholesaler at list price or in volume at 10 percent below list. In 1969 the State of California spent over $67,000,000 for drug products under the Medi-Cal program, with over 90 percent of such drugs being purchased from community retail pharmacist providers.

An examination of the legislative history of section 14053.5 establishes that the State of California intended to utilize its purchasing power under the Medi-Cal program to prevent marketing price discrimination between various authorized providers, in order to prevent the state from paying a higher price for the same drugs provided Medi-Cal patients simply because the nature or status of the provider might be different.

In the February 1967 Report of the Assembly Subcommittee on Health, Education and Welfare Services on Drug Prices (21 Assem. Interim Com. Rep. (1967) No. 18 Ways and Means, to be found in the 2 Appendix to Assem. J. (1967 Reg. Sess)),

referring specifically to "Multiple Pricing Practices," the report squarely addressed itself to the multiple pricing practices of drug manufacturers. The subcommittee report noted that certain drug manufacturers charged hospitals and clinics a lower price (regardless of the quantity purchased) than the price charged community pharmacies for the same drugs, and thus to the extent that such community pharmacies were forced to pay higher prices for the drugs later supplied to Medi-Cal program recipients, state pharmaceutical expenditures were inflated. The problem was likewise considered by the Senate in July of 1967 (Sen. Res. No. 337, 3 Sen. J. (1967 Reg. Sess.) p. 3644) and ultimately resulted in the enactment of section 14053.5 of the Welfare and Institutions Code.

We hold the trial court erred in concluding Robins' multiple pricing system did not come within the provisions of section 14053.5, since the language of the statute provides that a "prescribed drug" or "prescription drug" under the Medi-Cal program shall *not* include any drugs for which: (1) the manufacturer charges different prices to different categories of providers of prescription services; (2) the drug price is fixed by the manufacturer on a discriminatory basis; (3) the drug is unavailable to one or more classes of providers except on different terms and conditions than those available to other classes of providers; (4) the unavailability of the drug on the same terms and conditions to all classes of prescription providers is due to differing prices charged by the manufacturer on a discriminatory basis.

Applying these exclusionary criteria, there is simply no dispute that pharmacies operated by a proprietary hospital, community retail pharmacies and physicians and dentists in private practice are unable to obtain the 10 challenged drug products at the same price discount from list charged nonprofit hospitals or pharmacies operated by nonprofit hospitals, this in spite of the fact that both proprietary as well as nonprofit providers are specifically recognized as Medi-Cal drug providers. It is uncontradicted that Robins' formulary drug products are available to proprietary providers only through a drug wholesaler at 10 percent below list price. Thus the challenged drugs are unavailable to one or more classes of providers (here the proprietary providers), except at a different price than available to other classes of providers (nonprofit providers). Finally, the reason why Robins' 10 questioned drug products are unavailable on the same terms and conditions to all providers is due to the differing prices charged by Robins on a discriminatory basis, namely, refusing to make the drug available to proprietary providers at the same price as such drugs are made available to nonprofit providers.

Appellant state agency urges the trial court erred in concluding Robins' *refusal to sell* to proprietary providers did not come within the provisions of section 14053.5. Robins' *refusal to sell to proprietary providers,* without more, is not an issue in this case. (Cf. *United States* v. *Colgate & Co.* (1919) 250 U.S. 300 [63 L.Ed. 992, 39 S.Ct. 465, 7 A.L.R. 443]; *A.B.C. Distrib. Co.* v. *Distillers Distr. Corp.* (1957) 154 Cal.App.2d 175, 189 [316 P.2d 71]; *Cal.Bev. etc. Co.* v. *Distillers Distrib. Corp.* (1958) 158 Cal.App.2d 758 [323 P.2d 517].) The record is uncontradicted that Robins' drug products are available to all Medi-Cal providers, either by direct sales to nonprofit providers or indirect sales through drug wholesalers to proprietary providers. Thus Robins' marketing practices without a price differential are not factually before us. It is not the variety of marketing techniques or arrangements which is contrary to section 14053.5 so long as such marketing practices permit the challenged drugs to reach the hands of all drug providers at the same cost price subject only to quantity and time of payment discounts. ■ We think it apparent that section 14053.5 precisely intended to prevent a variation in the acquisition cost of drugs, which in turn would vary the billing costs of the same drugs, depending upon where a Medi-Cal patient elected to have a prescription provided. (See *Zimmerman* v. *Brian* (1974) 41 Cal.App.3d 563, 566-567 [116 Cal.Rptr. 211].)

■ The trial court concluded that the word "discriminatory," as used in section 14053.5, means "unreasonable, unfair and arbitrary."

Webster's New International Dictionary (2d ed. 1950), page 745, states "discriminatory" means "discriminative; showing favoritism." Further, "discrimination" means: "4. A distinction, as in treatment; esp., an unfair or injurious distinction. Spec., arbitrary imposition of unequal tariffs for substantially the same service; a difference in treatment made between persons, localities, or classes of traffic, in respect of substantially the same service." (Webster's, *op. cit.,* at p. 745.)

The legislative history of section 14053.5 fairly demonstrates that price differentials, not reasonableness or fairness, formed the statutory objective. Both the Senate and Assembly by identical resolutions directed appellant to eliminate multiple pricing practices of drug manufacturers related to the Medi-Cal program, particularly noting that such discriminatory pricing practices forced retail pharmacies "to pay higher wholesale prices for the same quantity of a given drug purchased than other buyers

pay; . . . ." (Sen. Res. No. 337, Sen. J. (1967 Reg. Sess.) p. 3644; Assem. House Res. No. 443, 3 Assem. J. (1967 Reg. Sess.) p. 5226.) Thus the kind of discrimination which the statute condemns involves the case at bench where proprietary providers must pay a higher acquisition price than charged to nonprofit providers for the same drugs. To the extent that Medi-Cal patients utilize proprietary providers, requiring the state to pay a higher cost for the same drug prescription, such price marketing discrimination tends to diminish efficient and economic utilization of Medi-Cal funds.

Accordingly, we conclude that the denial of the opportunity to proprietary providers of purchasing Robins' formulary drugs at the same price available to nonprofit providers is in fact discriminatory, warranting their removal from approved Medi-Cal formulary drug status until such cost differential is eliminated.

Robins contends that the federal government by acting in the area of price discounts to nonprofit institutions has preempted the field and thus the State of California is not free to legislate in any fashion that would conflict with the federal statute. (The provision exempting nonprofit institutions (15 U.S.C. § 13c), relied upon by Robins, provides in pertinent part as follows: "Nothing in Section 13 to 13b and 21a of this title [the Robinson-Patman Price Discrimination Act], shall apply to purchases of their supplies for their own use by schools, colleges, universities, public libraries, churches, *hospitals* and charitable institutions not operated for profit.") (Italics added.)

Robins urges that "to the extent that § 14053.5 is applied in a manner that prevents non-profit hospitals and the manufacturers who sell to such institutions from taking advantage of 15 U.S.C. § 13(c)" such application by appellants runs afoul the supremacy clause of the United States Constitution (art. VI).

Initially we note that the United States Supreme Court, on March 24, 1976, decided *Abbott Labs.* v. *Portland Retail Druggists,* 425 U.S. 1 [47 L.Ed.2d 537, 96 S.Ct. 1305] in which the court carefully delineated the type of drug dispensations which are to be categorized for a nonprofit hospital's "own use" and thus exempt from the Robinson-Patman Act by the provisions of section 13c. The court stated (pp. 10-11 [47 L.Ed.2d p. 547]): " . . . it seems to us to be very clear that a hospital's purchase of pharmaceutical products that are dispensed to and consumed by a

patient on the hospital premises, whether that patient is bedded, or is seen in the emergency facility, or is only an outpatient, is a purchase of supplies for the hospital's 'own use,' within § 13c."

The court further stated (p. 14 [47 L.Ed.2d 549]): "We therefore conclude that the exemption provision of the Nonprofit Institutions Act is a limited one; that just because it is a nonprofit hospital that is purchasing pharmaceutical products does not mean that all its purchases are exempt from Robinson-Patman; that the test is the obvious one inherent in the language of the statute, namely, 'purchases of their supplies for their own use'; and that 'their own use' is what reasonably may be regarded as use *by the hospital* in the sense that such use is a part of and promotes the hospital's intended institutional operation in the care of persons who are its patients. This implies the limitation and it turns the measure naturally from the purchase to the use, as § 13c requires. . . ."

Mindful of this recent decision by our highest court, we reject Robins' contention for several reasons.

Section 14053.5 does not prevent Robins from selling any of its drug products to nonprofit hospitals at an exempt 15 United States Code section 13c discriminatory price within the declared scope of *Abbott Laboratories, supra.* Nor do we perceive that the State of California could prevent Robins from doing so contrary to the now declared permissible exemption.

The question before us is not the right of Robins to sell its drug products at a discriminatory price free from a possible Robinson-Patman violation, but whether the State of California can remove from its approved drug formulary list certain Robins drug products because Robins has elected not to make available to all Medi-Cal prescription drug providers the same drugs at the same cost price.

The right of a manufacturer to sell its drug products does not guarantee either initial or continuing product eligibility of such drugs on the state's Medi-Cal formulary list. Accordingly, we hold that if a drug manufacturer elects to make available its drug products to proprietary providers only at prices higher than available to nonprofit providers, the state may remove such drug products from its approved drug formulary list.

Such action does not interfere with Robins' right to do business with any person, business or institution in the state; it simply means that a

dispenser of such drugs to Medi-Cal patients may not look to the state for payment, as such drugs are not on the state's formulary list of approved drugs.

■ Finally, Robins urges that section 14053.5 as applied by appellants constitutes an unreasonable exercise of the police power, not reasonably related to any valid regulatory purpose, and thus is a denial of due process.

This contention is without merit, since one purpose of section 14053.5 is to insure that Medi-Cal patients, and necessarily the state, are not compelled to pay a higher price for the same drug simply because the dispenser is a proprietary provider. This is a matter of significant state concern since, as shown by the record, approximately 90 percent of all Medi-Cal patient prescriptions are filled by proprietary providers. Under the Medi-Cal program, the choice of the provider rests with the patient. The ultimate cost of the prescription is paid by the state. As observed by the trial court in its intended decision: "The Medi-Cal patients to whom drugs are dispensed through [nonprofit] hospitals have a price advantage denied to the vast majority to whom drugs are dispensed through retail outlets." Conversely, the Medi-Cal patients to whom drugs are dispensed through proprietary hospitals, physicians and retail pharmacies are required to pay more for the same drugs because of Robins' price marketing practices. Thus the Robins formulary products cost Medi-Cal patients more or less for the identical drug based only upon where the prescription is ultimately filled.

The challenged statute is a proper exercise of the state's police power, since it demonstrates legislative concern with the preservation, cooperation and utilization of private enterprise drug providers in order to make available a broad, convenient and efficient source of drug products needed by Medi-Cal patients at nondiscriminatory prices.

The judgment in action number 203631 is reversed and the trial court is directed to dismiss the petition for writ of mandate.

The judgment of dismissal in action number 195213 is affirmed.

Appellants to recover costs.

Friedman, Acting P. J., and Janes, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 15, 1976.