[No. A037119. First Dist., Div. One. Feb. 24, 1988.]

ROBERT APTE, Plaintiff and Respondent, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Appellants.

## COUNSEL

James E. Holst, Christine Helwick, Milton H. Gordon and David M. Birnbaum for Defendants and Appellants.

Andrew Thomas Sinclair for Plaintiff and Respondent.

## OPINION

**NEWSOM, J.**—The Regents of the University of California (hereafter University) appeal from a judgment of the Superior Court of Alameda County granting a peremptory writ of mandate in favor of a former employee, Robert Apte, with the rank of associate professor, in the school of public health, at the University of California, Berkeley. The litigation was precipitated by a faculty vote of department A of the school of public health on May 8, 1979. At that time, Apte served as director of two teaching programs—Community Mental Health (hereafter CMH) and Native American Program in Mental Health Planning and Administration (hereafter Native American Program)—and derived 50 percent of his salary from each position. The faculty vote terminated the CMH program effective June 30, 1979, and the Native American Program effective June 30, 1980, with the incidental effect of reducing Apte's faculty position 50 percent for the 1979-1980 academic year and eliminating it entirely thereafter.

Apte appealed the decision under the University's grievance procedure for nonsenate academic appointees to a three-member hearing committee chaired by the dean of the law school. The committee heard three days of testimony and prepared a 31-page report concluding that the termination of Apte's positions was an unreasonable action in violation of University policy. Pursuant to University procedure, the report was sent to the chancellor for final decision with the recommendation that Apte be paid 50 percent of his salary for the 1979-1980 academic year, and his full salary for the 1980-1981 academic year and that he be given some "appropriate compensation" for legal fees and lost salary in the following two academic years. The

chancellor, however, rejected the committee's recommendations in a letter, dated December 7, 1981, that upheld the faculty vote.

Apte filed a petition for a writ of mandate in the Alameda County Superior Court, seeking to set aside the chancellor's decision. In an order entered July 19, 1984, the court found that the chancellor did not rely on the administrative record in reaching his decision and directed him to reconsider the decision on the basis of an independent review of the record.[1] The chancellor complied in a letter, dated January 11, 1985, that again upheld the faculty decision but granted Apte full salary for the 1979-1980 academic year on the ground that he had received inadequate notice of termination. Apte then petitioned the superior court for a second writ of mandate. In a judgment filed October 8, 1986, the court granted a peremptory writ of mandate ordering the University to pay Apte his salary and benefits for the 1980-1981 school year, plus attorney's fees of $1,500, and to conduct an evidentiary hearing for the purpose of determining Apte's right to compensation for loss of salary in subsequent academic years.

At the time of his dismissal, Apte had worked 13 years in university programs having an essentially provisional character. His department in the school of public health consisted largely of a number of specialized professional training programs, supported by federal grants, which were commonly described as "soft money" programs, indicating that their funding could end when the grant expired. The programs were largely autonomous, subject only to the scrutiny and control of the funding agency, but required the sponsorship of a tenured faculty member known as the "principal investigator." Apte began his career in 1966 as a lecturer in the CMH program, funded by the National Institute for Mental Health (NIMH). In 1971 he became director of the program. The following year it was moved to department A of the school of public health where Professor Henrik Blum consented to act as principal investigator. Apte gained the rank of associate professor and was responsible in 1979 for administering an annual budget of $2 million in federal grants and for supervising seven teaching faculty members. But since he belonged to the "clinical series" of academic appointments, he lacked formal tenure.

Many faculty members and administrators viewed with concern the fragmentation of the school of public health into semi-autonomous programs that escaped any integrated administration. In 1977, when Richard Bailey

---

[1] The chancellor was understandably troubled by unnecessarily broad language in the order that seemed to require him to conduct a de novo review of the record in all appeals of this kind, thus undercutting the utility of the hearing panel. In the context of the litigation, it appears that the order was intended only to require the chancellor to find justification in the record for findings of fact that diverge from those of the hearing panel.

became chair of department A, the dean of the school of public health gave him a mandate to curtail the scope and importance of these programs. In his first year and a half in office, Chairman Bailey was unable to induce the faculty to make any hard decisions. Each program had a constituency that effectively blocked change. Apte's CMH program appeared to enjoy particularly solid support. A review of the program in 1974 had recommended that it "be made a regular part of the School of Public Health" and that the next tenure-rank position be allocated to the program.

The CMH program was effectively enlarged in 1978 by the creation of a closely associated program, the Native American Program, which drew heavily on CMH courses and had the same faculty sponsor, Dr. Henrik Blum. The Native American Program received a five-year grant from NIMH commencing in July 1978. It is noteworthy that the administration of the school of public health agreed to graft this new program onto the older CMH program at a time when it was committed to reducing soft-money programs. Moreover, the fact that the Native American Program grant extended to 1983, four years beyond the current CMH grant, appeared to reflect a general expectation that the CMH grant would be renewed. In order to serve as director of the new program, Apte reduced by 50 percent his commitment to the older CMH program. During the 1978-1979 academic year, he divided his time between the two programs.

■ Before recounting the history of Apte's dismissal, we will consider the standard of review on appeal. We first observe that we are not free to indulge in an independent reconstruction of the events: our view of the record must be circumscribed by a limited appellate review of University proceedings.

■ Under article IX, section 9, of the California Constitution the University constitutes "a public trust" possessing "full powers of organization and government" and "all the powers necessary or convenient for the effective administration of its trust. . . ." "The Regents have the general rule-making or policy-making power in regard to the University [citation], and are (with exceptions not material here) fully empowered with respect to the organization and government of the University . . . ." (*Goldberg* v. *Regents of the University of California* (1967) 248 Cal.App.2d 867, 874 [57 Cal.Rptr. 463].) "As a consequence, policies established by the Regents as matters of internal regulation may enjoy a status equivalent to that of state statutes. [Citation.]." (*Regents of University of California* v. *City of Santa Monica* (1978) 77 Cal.App.3d 130, 135 [143 Cal.Rptr. 276].) In *Ishimatsu* v. *Regents of University of California* (1968) 266 Cal.App.2d 854, 864 [72 Cal.Rptr. 756], it was first held that the constitutional grant of power to the University includes the grant of quasi-judicial powers. The decision has

found general acceptance. (*Smith* v. *Regents of University of California* (1976) 58 Cal.App.3d 397, 400 [130 Cal.Rptr. 118]; *Amluxen* v. *Regents of University of California* (1975) 53 Cal.App.3d 27, 33 [125 Cal.Rptr. 497].)

█ Where a "statewide agency is delegated quasi-judicial power by the Constitution, the reviewing court is limited to determining whether there was substantial evidence supporting the agency's decision." (*Ishimatsu* v. *Regents of University of California, supra,* 266 Cal.App.2d at p. 862; fn. omitted.) "Substantial evidence has been defined as 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion, . . .'" (*Hosford* v. *State Personnel Bd.* (1977) 74 Cal.App.3d 302, 307 [141 Cal.Rptr. 354].) Until 1970, the courts had generally followed the so-called isolation test in applying the substantial evidence rule, viewing only the evidence supporting the agency's decision and disregarding conflicting evidence. (Cal. Administrative Mandamus (Cont.Ed.Bar Supp. 1987) § 5.75, p. 84.) But it is now clear that the trial court must review the entire record. (*LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432]; *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 94 [84 Cal.Rptr. 113, 465 P.2d 1].) Most significantly, the Supreme Court has cited with approval the substantial evidence test of *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 487-490 [95 L.Ed. 456, 467-469, 71 S.Ct. 456]. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242].) Assuming that *Universal Camera* now applies in California, a recent decision concluded, "[t]he test now is that a court reviewing the evidentiary basis of an agency's decision must consider all relevant evidence in the administrative record including evidence that fairly detracts from the evidence supporting the agency's decision [Citations]. The trial court's and appellate court's functions are still identical regardless of whether the trial court upheld or overturned the administrative action. [Citation.] [¶] Under the *Universal Camera* rule, however, both the trial and appellate courts have broader responsibility to consider all relevant evidence in the administrative record, both contradicted and uncontradicted. [Citation.] This consideration involves some weighing of the evidence to fairly estimate its worth [citation]." (*County of San Diego* v. *Assessment Appeals Bd. No. 2* (1983) 148 Cal.App.3d 548, 554-555 [195 Cal.Rptr. 895].)

In the present case, Apte availed himself of the quasi-judicial powers of the University by bringing an appeal under section 191 of the academic personnel manual applying to nonsenate academic appointees. Describing the policy of the section, paragraph 191-0 a. states, "[t]his policy is intended to protect appointees from arbitrary, capricious, or unreasonable actions by administrative officers, . . ." Subsequent paragraphs set forth the procedure of appealing "any matter concerned with . . . University employment" to a

hearing officer or a hearing committee. Paragraph 191-80 c.(6) defines the role of the hearing officer or committee in the following terms: "After reviewing the evidence, the University Hearing Officer, the Non-University Hearing Officer, or the University Hearing Committee shall determine whether or not the action appealed was arbitrary or unreasonable. The Hearing Officer or Committee shall make findings of fact, which shall be based upon substantial evidence, and a recommendation." A written report, containing the findings and recommendation, must then be submitted to the Chancellor for final decision. If the Chancellor rejects or modifies the recommendation of the hearing officer or committee, he "shall state the reasons in writing to the individual who filed the appeal, . . ."

■ In this case, we face an unprecedented question concerning the relevance of the hearing committee's finding of fact to our review of the chancellor's decision. The University notes that the substantial evidence test must be applied to the decision of the chancellor, not to that of the hearing committee, and implies that the hearing committee report is irrelevant because the chancellor did not follow it. Apte counters by citing administrative law decisions holding that an administrative board which delegates the task of hearing testimony to a referee must ordinarily accept the findings of the referee on issues of witness credibility. (*Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 318-319 [90 Cal.Rptr. 355, 475 P.2d 451]; *Lamb* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 281 [113 Cal.Rptr. 162, 520 P.2d 978].) The findings of the hearing committee are undoubtedly relevant to this appeal. First, the chancellor in effect incorporated those findings by reference in his decision by stating that he agreed "in general with the factual findings of the Hearing Panel." The decision presumably adopts the findings of the committee unless it states otherwise. Second, under the current substantial evidence test the reviewing court is required to review the entire record, including the hearing committee's report. Since the committee alone was in a position to evaluate the credibility of witnesses, its conclusions may be considered in weighing the probative value of the evidence.

■ A qualification to the substantial evidence rule has considerable relevance to this appeal: the rule does not apply to questions of law. The reviewing court is free to determine independently the application of laws, regulations, or procedures. (*Strode* v. *Board of Medical Examiners* (1961) 195 Cal.App.2d 291, 303 [15 Cal.Rptr. 879].) ■ This construction of the substantial evidence rule applies to the interpretation of University policies and procedures which have the status of statutes in its internal governance. It clearly comes into play where the facts are undisputed. "When the facts before an administrative agency are uncontradicted, the trial court's determination of their legal effect involves solely a question of

law." (*Swaby* v. *Unemployment Ins. Appeals Bd.* (1978) 85 Cal.App.3d 264, 269 [149 Cal.Rptr. 336]; *A. H. Robins Co.* v. *Department of Health* (1976) 59 Cal.App.3d 903, 907 [130 Cal.Rptr. 901].) A threshold issue in this appeal involves such a question of law.

In his first decision, the chancellor stated unequivocally that as a nontenured employee Apte did not have an "expectation of, or a property interest in, continued reappointment." Certain passages in the decision on appeal advert to a similar premise. The chancellor describes the staff of CMH as "temporary year-to-year appointees" and asserts, "[a]ll undoubtedly assumed that [Apte's] 'temporary' position would likely terminate if the federal sources of funding for it evaporated." Again, he denies that by terminating Apte's position the University incurred an obligation to find him alternative employment. "I find no evidence in the record," he writes, "demonstrating the existence of such a rule or principle. I further reject this conclusion for the following reasons: (a) It is inconsistent with Apte's year-to-year appointment and (b) It would unduly constrain departments from ending transient programs that are evidencing difficulty, . . ."

The chancellor's finding, however, differs from a finding of the hearing panel, which concluded: "[I]n entering into a multi-year project and hiring faculty to provide service in it, we believe that the University has undertaken an obligation to maintain the project and continue the employment of its faculty over its stipulated life-time, as long as performance is satisfactory, budgetary support is available, and barring some special circumstance in which program continuation imposes significant and unforeseen costs upon the University." Apte contends that we are required to accept this conclusion as a matter of law under the holding of *Adelson* v. *Regents of University of California* (1982) 128 Cal.App.3d 891 [180 Cal.Rptr. 676]. Remarkably enough, *Adelson* also concerned an associate professor in a community mental health program, funded by the NIMH, who appealed his dismissal to a faculty hearing committee. The committee reached a conclusion very similar to that in the present case: " '[F]airness demands, and in our experience on the campus practice provides, that faculty members in "soft money" positions of long duration and associate professor or professor rank should not be terminated except for adequate cause as long as the extramural funds for their project continue.' " (*Id.* at p. 893.)

*Adelson* nevertheless must be distinguished from the case at bar. The chancellor there did not challenge the finding of the hearing committee on the practice of continued employment of academic personnel throughout the term of federally funded programs; the court thus could assume the validity of the finding. Here, the chancellor's finding indirectly contradicts

those of the hearing committee, but the record contains almost no evidence on the issue;[2] therefore, we are not able to resolve the question of whether or not University practice gave Apte some right to continued employment throughout the life of his funded program. The undisputed evidence, however, does permit certain limited legal conclusions.

▮ The University policy protecting employees from "arbitrary, capricious, and unreasonable" action reflects a standard of fairness. The Chancellor forthrightly recognized this standard in awarding Apte full pay for the 1979-1980 academic year; although no university policy explicitly entitled Apte to this pay, the Chancellor concluded that it was not "fair to Apte to deprive him of one-half his position on such short notice (some 7 or 8 weeks)." Written University policies similarly make the required notice of termination to academic senate employees proportional to length of service. ▮ It has been held that the covenant of good faith and fair dealing implied by law in employment contracts may require an employer to take into account an employee's length of service and organizational rank as well as the employer's own personnel practices. (*Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 328-329 [171 Cal.Rptr. 917]; *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443, 445-456 [168 Cal.Rptr. 722].) Without deciding whether this covenant may be implied in University employment contracts, we may still look to such precedents construing the covenant of good faith and fair dealing for guidance in giving content to the standard of fairness incorporated in the University's policies and practices.

▮ In the present case, the undisputed evidence reveals that at the time of his termination Apte had worked 13 years for the University with no adverse record, attained the rank of associate professor, and was supported by a multiyear grant that had received University support. These facts are not only relevant in considering whether the University acted arbitrarily, capriciously, or unreasonably in terminating his positions, but impose on the University affirmative obligations to mitigate the hardship resulting from the termination of his positions by providing reasonable notice and making some reasonable effort to find available alternative employment.

In relating the events leading to Apte's termination, we will begin with the statement of facts in the chancellor's decision and the findings of the hearing committee impliedly incorporated in the decision. And we will examine the entire administrative record only with respect to two details for which the chancellor's statement of facts arguably lacks support in the

---

[2] The only evidence consists of Apte's own self-serving statements.

record. These two points concern the faculty support of the CMH program and the uncertainty of renewed federal funding.

The Chancellor asserts that the CMH program "had powerful defenders, as well as critics." The eventual termination of the program "settled a longstanding controversy." This interpretation finds solid support in the testimony of the department chairman, Dr. Bailey, and the CMH principal investigator, Dr. Blum. Bailey testified that the program "was in the process of being phased out. . . ." And Blum concurred, "[w]e were hassling this for years. There were several people that were anxious to get rid of it years before." The hearing committee, in contrast, discounted entirely this testimony and pointed instead to the actual record of faculty support. A year before NIMH funding for the CMH program was scheduled to expire, Apte sent a new grant proposal to chairman Bailey and four division heads and circulated a memo describing the proposal to all tenured faculty members. Bailey appointed a committee to study the proposal. At a faculty meeting on June 19, 1978, the committee recommended its approval. The minutes of the meeting do not reveal any opposition and, according to Apte, the faculty voted to endorse the grant proposal with only one dissenting vote. Early the next year, chairman Bailey met with representatives of NIMH to express support for the grant, although he says he harbored personal reservations.

It is undisputed, however, that Apte's other teaching program, the newly established Native American Program, became the center of an embarrassing and emotional controversy. As the chancellor recounts, "[t]he program was beset with substantial problems during its trial run in 1977 and thereafter. The initial complaint was too little Native American participation in planning and operation and Dr. Apte's extent of control. In its first summer of formal existence, 1978, a search committee of four, on which both Dr. Apte and Professor Blum served, chose Dr. John Red Horse, a Native American, to serve as full-time lecturer in the Program under Dr. Apte, the Director. . . . [¶] Red Horse and Apte hit it off very badly. It appears that Red Horse sought to wrest control of the Program from Apte, was often uncommunicative or absent, and was generally hostile and quite difficult to direct. . . . In mid-November, Red Horse forcefully and, in retrospect, unreasonably complained about a submission Apte was making to NIMH. . . . Red Horse continued to operate largely on his own. Further, in April Red Horse launched a wide-ranging attack on Apte in a memorandum to Blum, copies of which Red Horse circulated to Bailey and Native American students in the School." The memorandum, strongly disparaging Apte's personal integrity, was in fact sent to *all* Native American students at the University.

Apte responded by writing a string of memoranda and by trying to enlist the support of Bailey and Blum. But, the chancellor notes, "[n]either Bailey nor Blum sought to take over the Apte-Red Horse problem and solve it. Bailey saw it as the principal investigator's (Blum's) affair if anyone's, and Blum saw it as Apte's problem—the problem of the Director of the Native American program." Caught in a cross-fire of memoranda, Blum sought to detach himself from the controversy by assuming neutrality and encouraging Apte and Red Horse to resolve their differences.

As his problems with Red Horse were building to a crescendo, Apte learned through a telephone inquiry that a committee of the NIMH had turned down his grant proposal. Current funding for the CMH program would terminate on June 30, 1979. The news was totally unexpected; a year earlier a NIMH official had solicited the sort of proposal Apte prepared. Apte was informed, however, that the committee's action was based on procedural rather than substantive reasons. His contact on the committee "said the reason for it was that there was a feeling that it belonged in another division. It shouldn't have come to that particular view committee." Apte immediately wrote NIMH vigorously urging a reconsideration of the proposal. Dr. Blum, the principal investigator, cosigned the letter. Dr. Bailey, department chairman, approved it and spoke of possible tactical countermoves. In the following weeks, Apte received no official communication from the institute denying the proposal—in itself an encouraging sign. The committee was scheduled to meet again on May 9-11.

The chancellor's account of these events is factually correct but conveys the implication that action of the NIMH committee possessed an apparent finality. He writes, "[i]n March 1979 Apte found out informally that NIMH would act negatively and he and Dr. Blum (with Dr. Bailey's assent) wrote NIMH asking for reconsideration. Such reconsiderations are rare." This implication has no support in the record. As the hearing panel found, "the situation in respect to continued federal funding of CMH was one of uncertainty, . . ." In fact, NIMH later took the position that it had never denied the grant and treated the proposal as a deferred application meriting rapid consideration.

In fact, the 1,300 pages of transcript in this case contain remarkably little information on the key event—the vote to terminate the CMH program and the Native American Program. The chancellor sets forth the bare facts: "On May 8, 1979, under the urgings of Chairman Bailey, and with the concurrence of Professor Blum, the regular faculty of the School of Public Health (those with Academic Senate membership) passed a resolution terminating CMH as of June 30, 1979. This had the incidental effect of reducing Apte's faculty position by 50% as of June 30, 1979." At the same meeting, the

faculty voted to end the Native American Program a year later, on June 30, 1980. Both votes were on the motion of Dr. Blum, the principal investigator of the programs, and passed unanimously.

The department chairman, Dr. Bailey, had told Apte that he was not invited to the meeting. Though technically proper, the instruction was unusual. As an appointee in the clinical series, Apte was not a member of the academic senate and was not entitled to vote at faculty meetings, but he had generally participated in faculty discussions on an equal basis with other faculty members. Apte was not informed of any action to be proposed at the meeting, but he knew of Dr. Bailey's inclination to scuttle the CMH program. Shortly after learning that the CMH grant proposal was in jeopardy, "Bailey notified applicants to the CMH Program that it would not be offered in 1979-1980 and gave them information about other curriculum tracks." The chancellor explains that "[t]his was necessary because new obligations under the Program could not be undertaken without better assurance of federal funding."

In an observation critical to this case, the chancellor notes, "Apparently, the faculty was not informed of the Apte-Blum request to NIMH for reconsideration [of the CMH grant]." Indeed, the vote was plainly predicated on the assumption that funding had been turned down. The Native American Program, which enjoyed continued funding, was allowed to continue for one year after termination of the CMH program. Blum later remarked that he was "astounded" when the CMH proposal was reconsidered and Bailey also regarded the denial of funding as an accomplished fact. This shared assumption presumably explains why the faculty would vote unanimously to terminate a program that it had approved with one dissenting vote a year earlier.

As the chancellor interprets the vote, "[i]t appears that the faculty vote was largely a product of Dr. Bailey's arguments to take this opportunity to reduce soft-funded programs and . . . Professor Blum's unwillingness to continue as principal investigator and his authorship of the motion to end CMH." Bailey's position stemmed from his desire to reduce the number of soft-money teaching programs; the funding problems of CMH offered an opportunity to eliminate one such program. The reasons for Blum's change of mind can only be inferred. The chancellor writes, "[c]learly, Blum was infuriated with what he described as the 'huge hassle' [of the Apte-Red Horse imbroglio]. He blamed both participants. He came to the conclusion that the Program was not worth the controversy—that it was an intolerable burden to him personally, and a potential threat to the credibility and capability of the School of Public Health . . . . [¶] The foregoing explains why Professor Blum on May 8, 1979 would move for an early termination

of the Native American program (June 30, 1980). It does not explain his like motion to terminate the whole CMH program. It is conceivable, of course, that he had simply become disenchanted with Apte. It is also possible, of course, that, in addition, he simply acceded to Chair Bailey's desires because at that time the probabilities of continued funding to CMH [were] so doubtful."

Very shortly after the meeting, Apte learned that the NIMH would reconsider the CMH proposal. In the chancellor's words, "[i]ronically, NIMH later changed its mind and awarded a two-year grant that would have permitted continuation of the CMH Program. Notification that a re-review would take place was communicated in late May. Notification of favorable action occurred in August. Blum rejected the grant in November. The faculty was not asked to reconsider its May 8th action either in June (after notification of a re-review) or after the August award." At the next faculty meeting on June 7, 1979, neither Bailey or Blum informed the faculty that the CMH proposal was still under consideration. Without consulting the faculty, Blum wrote the NIMH on November 7, 1979 that "the Department had decided not to accept the new CMH grant."

In rejecting the hearing committee's conclusion that the May 8 vote constituted an arbitrary, capricious or unreasonable action, the chancellor articulated a specific understanding of this standard, saying: "I would agree with this conclusion if it was shown by the grievant that the Department acted for improper motives. This was not shown to the Hearing Board, nor do I find support for such a finding in the record. The Hearing Board found neither malice toward Apte nor improper political motivation." In fact, a certain element of personal prejudice, if not malice, did enter into the decision. According to the chancellor's own account, Dr. Blum's decision to withdraw support from the CMH program was largely based on a desire to relieve himself of the "hassle" of dealing with the closely linked Native American Program. But, more significantly, the chancellor's analysis of the arbitrary, capricious, or unreasonable standard fails to recognize that ". . . [the] exclusion of evidence that is crucial to a party's case can in some circumstances be the essence of unfairness." (3 Davis, Administrative Law Treatise (2d ed. 1980) § 16.11, p. 264.) ■ Under California administrative law, an abuse of discretion can occur when a party is denied the right to present a defense (*King* v. *Board of Medical Examiners* (1944) 65 Cal.App.2d 644, 651-652 [151 P.2d 282]), to present the testimony of key witnesses (*Evans* v. *Industrial Acc. Com.* (1945) 71 Cal.App.2d 244, 248 [162 P.2d 488]), or to take testimony out of state (*Kaiser Co.* v. *Industrial Acc. Com.* (1952) 109 Cal.App.2d 54, 57 [240 P.2d 57]).

The decision to eliminate the CMH program may in the abstract have been within the bounds of reasonable opinion, but if it was taken without reference to relevant information, it may still acquire an arbitrary character. In *Madonna* v. *County of San Luis Obispo* (1974) 39 Cal.App.3d 57 [113 Cal.Rptr. 916], the county board of equalization had before it two widely diverging evaluations of a piece of property—one based on replacement cost and the other on capitalized income. The board chose an assessment figure between the two extremes. Clearly, the assessment was within the range of reasonable evaluations, but it was adopted without reference to the data before the board. The court held the assessment to be arbitrary.

It cannot be doubted that there was a reasonable basis for terminating the CMH program and the associated Native American Program. The chancellor, an eminently reasonable man, favored this result. But in the context of actual events, the May 8 vote was largely the product of manipulation involving the exclusion of facts crucial to Apte's case—the fact that Apte and Blum had requested reconsideration of the grant proposal and the fact that under the peculiar circumstances of the case the request had an appreciable chance of acceptance. The pattern of manipulation was sealed when Bailey and Blum failed to inform the faculty of the subsequent approval of the CMH grant. In view of Apte's rank, years of service, and employment in multiyear programs, this exclusion of evidence crucial to his case assumes a degree of unfairness that constitutes arbitrary, capricious, or unreasonable action.

The chancellor fears that a decision favoring Apte would hamper the University in ending "programs that are evidencing difficulty, unduly straining resources, such as space and time, better used otherwise, and shaping curricula unwisely." He refers particularly to the hearing committee's conclusion that the two programs should not have been ended without a thorough investigation. Whether or not such an investigation was desirable, it should be noted that a minimum standard of fairness might have been met by other means, such as preparing an impartial written report, referring the matter to a committee, or simply allowing Apte a brief opportunity to speak on the motions before voting.

With respect to Apte's right to relief, Code of Civil Procedure section 1095 provides that a judgment granting a writ of mandamus may allow the petitioner to "recover the damages which [he] has sustained, . . ." (See also *Warner* v. *North Orange County Community College Dist.* (1979) 99 Cal.App.3d 617, 628 [161 Cal.Rptr. 1]) The judgment in this case ordered the university to "pay to petitioner his salary and benefits for the 1980-81 academic year, less any earnings received from other employment, plus interest at the legal rate; and . . . conduct an evidentiary hearing

before the Hearing Panel to determine how long petitioner would have continued to be employed under the Community Mental Health program and/or the Native American program, but for the unlawful conduct of the School in terminating him, and, if would [*sic*] have continued to be employed, afford him an appropriate remedy; . . ."

The award of salary and benefits for the 1980-1981 academic year was based on the finding that "[t]he evidence shows that the CMH and Native American programs would have continued until at least the end of the 1980-81 academic year"—the time when the two-year NIMH grant for the CMH program would expire. A reasonable basis for this finding can be found in the record of support for CMH, the close linkage of the Native American Program to CMH, and the considerations of fairness that constrain the termination of faculty members enjoying Apte's employment status. But any award of damages for subsequent academic years would necessarily involve elements of conjecture: would the school of public health have approved an application for renewed funding of the CMH program? And would the NIMH under the direction of a new administration have approved a subsequent grant application? The evidentiary hearing ordered by the trial court could not reach any conclusion without indulging in such speculations. Therefore, the judgment is modified to the extent that it orders this further proceeding.

Lastly, for the same reasons supporting the finding that the University acted arbitrarily, we find no merit in the University's objection to the award of attorney's fees under Government Code section 800.

The judgment as so modified is affirmed.

Racanelli, P. J., and Elkington, J., concurred.

Petitions for a rehearing were denied March 24, 1988, and the opinion was modified to read as printed above.