### UNIX SYSTEM LABORATORIES, INC., Plaintiff,

v.

### BERKELEY SOFTWARE DESIGN, INC.; The Regents of the University of California; and the Following Persons in their Individual and Official Capacity as Members of the Board of the Regents of The University of California: Pete Wilson, Leo T. McCarthy, Willie L. Brown, Jr., Bill Honig, David P. Gardner, Ralph M. Ochoa, Gail G. Anderson, William T. Bagley, Roy T. Brophy, Clair W. Burgener, Yvonne Braithwaite Burke, Glenn Campbell, Frank W. Clark, Jr., Diana Darnell, Tirso Del Junco, Alice J. Gonzales, Jeremiah F. Hallisey, S. Sue Johnson, Meredith J. Khachigian, Leo S. Kolligian, Howard H. Leach, S. Stephen Nakashima, Yori Wada, Dean A. Watkins, Harold M. Williams, Jacques S. Yeager, Carl J. Stoney, Jr., Paul Hall, Martin A. Trow and W. Elliot Browniee, Defendants.

Civ. No. 92–1667.

United States District Court, D. New Jersey.

Sept. 8, 1993.

---

Paul, Hastings, Janofsky & Walker, New York City, George L. Graff, James W. Kennedy, Crummy, Del Deo, Dolan, Griffinger & Vecchione, P.C., Newark, NJ, Michael D. Loprete, Gary F. Werner, Unix System Laboratories, Inc., Summit, NJ, Sanford Tannen-

baum, Gen. Counsel, Theodore Weitz, Sr. Corporate Counsel, for plaintiff.

Crosby, Heafey, Roach & May, Oakland, CA, Joel Linzner, Carla J. Shapreau, University of California, Oakland, CA, James E. Holst, John F. Lundberg, Mary E. MacDonald, Post, Polak & Goodsel, Roseland, NJ, Frederick B. Polak, for defendant Regents of the University of California.

Heller, Ehrman, White & McAuliffe, Palo Alto, CA, Leslie A. Fithian, Saiber Schlesinger Satz & Goldstein, Newark, NJ, James H. Forte, for defendant Berkeley Software Design, Inc.

### *OPINION*

DEBEVOISE, District Judge.

Plaintiff Unix System Laboratories, Inc. ("USL") instituted this action seeking relief from Defendants' past and prospective distribution of computer software in alleged violation of Plaintiff's proprietary rights in the UNIX operating system. Defendants now move to dismiss all of Plaintiff's claims against the Regents in their individual and official capacities ("the Regents"), and four of Plaintiff's five claims against the Regents in their corporate capacity as the Board of Regents of the University of California ("the University").[1] For the reasons given below, Defendants' motions are granted in part and denied in part.

### I. STATEMENT OF FACTS

Plaintiff Unix System Laboratories ("USL") is a Delaware corporation with its principal place of business in Summit, New Jersey. Plaintiff develops, manufactures, licenses, and sells computer operating systems and related products and services. Plaintiff is also the present assignee of AT & T's rights to UNIX, the computer software at the heart of this dispute. Defendant Berkeley Software Designs, Inc. ("BSDI") is a recently-formed Delaware corporation with its principal place of business in Richmond Falls, Virginia. BSDI intends to develop, manufacture, and sell computer operating systems like those of Plaintiff. Defendant officials are members of the Board of Regents (the "Regents") of the University. The Regents are a non-profit public corporation organized to administer the University pursuant to the California constitution, art. 9 § 9, and California state law.

### A. Background

The central issue in the case as a whole is whether Defendants appropriated pieces of Plaintiff's allegedly proprietary program "UNIX," and then used and distributed these pieces without authorization in violation of Plaintiff's copyrights and trade secrets. UNIX is a computer operating system—a software program that oversees a computer's internal and external activities, including processing, resource allocation, communications, and applications use. AT & T's Bell Laboratories registered the name UNIX as Trademark No. 1,392,203 on May 6, 1986. (1st Am.Compl. Ex. B.) In addition, AT & T has received copyright certificates of registration on various versions of UNIX software and documentation. (*Id.*, Exs. C–F.)

Before exploring the details of Plaintiff's allegations, it is important to step back and appreciate the importance of UNIX in the world of computing. All parties agree that UNIX is one of the most highly-regarded operating systems in the world. Numerous treatises, courses, graduate student theses, and research projects have investigated, expounded, and improved upon UNIX. In addition, programmers at Microsoft, Sun Microsystems, Digital, IBM, and elsewhere have all developed their own UNIX-like,

---

1. The Regents have three different capacities: their capacities as individuals, their capacities as officials of the state of California, and their unitary capacity as the University of California corporation/state agency (see *infra*). The caption names the Regents in their individual and official capacities, but the parties treat the lawsuit as one against the Regents in their official and corporate capacities. For example, Plaintiff appears to eschew any relief against the Regents in their individual capacities. Plaintiff's "request for injunctive relief against the University is directed to the Regents in their official capacity for supervising and administering the University's affairs." (2d Am.Compl. at ¶ 2.) Furthermore, Plaintiff states that "[a]lthough it is seeking damages against the University and BSDI, it is not seeking damages against the Regents in their individual capacity." (*Id.*)

UNIX-compatible operating systems (some under license by Plaintiff). (Carson Reply Aff. at ¶¶ 11–12.)

AT & T developed UNIX in the late 1960s and early 1970s, and then quickly began licensing UNIX to educational, government, and commercial users, including the University of California at Berkeley ("Berkeley"). Berkeley and AT & T apparently collaborated on UNIX's development at least in the early years, with AT & T personnel often visiting Berkeley for consultations. The parties executed their first UNIX licensing agreement in 1973, and by 1979 the parties had executed their first agreement covering the software that Plaintiff now seeks to protect, UNIX version 32V. The 32V agreement permits the Regents to create derivatives of UNIX and, to the extent that the derivatives are free of proprietary information, to distribute them without restriction.

Berkeley exercised its contractual right to derivatize 32V to the hilt. It began to create its own embellishments and additions, called Berkeley Software Distributions ("BSD") releases, and distributed them via the Regents' Computer Sciences Research Group ("CSRG"). In the early 1980s, Berkeley only distributed the releases to other licensees (which now number in the thousands) because the releases contained proprietary code governed by Berkeley's license with AT & T. But demand for the releases from unlicensed users grew, so Berkeley began distributing redacted releases with the proprietary material allegedly removed. These releases included the operating system at the heart of the present dispute, Net2, which Plaintiff has alleged violates its proprietary rights in 32V.

Net2 apparently began as a project to develop a UNIX-like product devoid of AT & T proprietary code. This product was to contain both non-proprietary software from the BSD releases and software written specifically for Net2, sometimes by volunteers. (Kennedy Aff., Ex. 6.) To guarantee that no proprietary code remained, CSRG screened and eliminated overlapping code sections in accordance with criteria developed together with Berkeley's legal counsel. In addition, Berkeley "repeatedly contacted the USL licensing office, in an attempt to have them

review software we intended to distribute." (McKusick Decl. at 8.) Plaintiff allegedly refused to cooperate, although it had performed similar services for others.

Berkeley's decision to excise AT & T's code was motivated by several related concerns. First, the University of California received substantial benefits by being the center of UNIX software development, benefits that would increase if it could expand the family of UNIX users by extending UNIX to non-licensees (*Ibid.*); second, the cost of an AT & T UNIX license had increased to around $200,000, excluding all but the largest users (*Ibid.*); third, the Net2 version of UNIX would offer new and improved services (Keith Bostic, Marshall K. McKusick, & Michael J. Karels, *Berkeley UNIX Yesterday, Today and Tomorrow*, in Kennedy Aff. Ex. 8); and finally, the CSRG programmers, at least those who founded BSDI (Karels, McKusick, and Bostic), presumably saw in Net2 an opportunity to profit from the widespread interest in UNIX-like systems.

The end result of Berkeley's efforts was a product that, by all accounts, contains a very small proportion of 32V code. But this is not to say that Net2 fails to display its 32V roots. Plaintiff hired Professor John Carson to unearth these roots and, after over 400 hours of digging, Professor Carson has now identified a number of instances where 32V code is embedded in the Net2 system. (Carson Aff. at ¶ 13.) The legal significance of this code is, of course, the central issue in the present dispute.

Berkeley began licensing and distributing Net2 in June 1991. Plaintiff has alleged that the "highest levels," meaning persons reporting directly to the Regents, approved Net2's release. (*E.g.* Proposed 2d Am.Compl. at ¶¶ 2, 9, 38, 64, 72, 89, 103.) Indeed, Plaintiff has alleged that the University Chancellor himself approved Net2's release. (Kennedy Aff. ¶ 16.)

An early Net2 licensee was UUNET, an electronic information exchange for people interested in UNIX. (Adams Dep. at 149, Kennedy Aff. Ex. 12.) UUNET added Net2 to its standard archives, enabling any subscriber to UUNET to freely and anonymous-

ly copy Net2 to their own computer system. When asked the number of people who had copied Net2 from UUNET, Mr. Bostic replied that "I've been told it's in the tens of thousands." (Bostic Dep. at 81, *Id.*). UUNET is available to hundreds of thousands of users worldwide, including users in New Jersey. (Rorke Aff. ¶¶ 1–4.)

One organization that obtained Net2 from UUNET was BSDI. (Adams Dep. at 149, Kennedy Aff. Ex. 12.) BSDI, which is not licensed by AT & T to use UNIX, used Net2 to create its sole product, the operating system BSD/386 Source. (Ans. & Countercl. at ¶¶ 5–6.) BSDI is now close to bringing BSD/386 to market, having distributed preliminary "alpha," "beta," and "gamma" versions of BSD/386 as well as promotional literature. This literature states that BSD/386 Source "contains no AT & T licensed code" and "does not require a license from AT & T." (1st Am.Compl. Ex. I.) Unless Plaintiff is successful in this suit, it will soon have another competitor in the field of UNIX-like operating systems.

### B. The Present Motions To Dismiss

The central issue in the present motions to dismiss is whether the University is tantamount to the state of California for purposes of the Eleventh Amendment. The University of California is defined as a state agency by state law, Cal.Gov't.Code § 3202(b), and as "a public trust, to be administered by the existing corporation known as 'The Regents of the University of California,'" by the California Constitution. CAL. CONST. art. IX, § 9(a). The University corporation is comprised of:

> a board composed of seven ex officio members, which shall be: the Governor, the Lieutenant Governor, the Speaker of the Assembly, the Superintendent of Public Instruction, the president and the vice president of the alumni association of the university and the acting president of the university, and 18 appointive members appointed by the Governor and approved by the Senate....

*Id.*

The general powers of the University are established by the California Constitution. These powers are extensive, encompassing the "full powers of organization and government," CAL. CONST. art. IX, § 9(a), including the powers to manage and dispose of University property; to acquire property; to sue and be sued; to use a seal; to delegate authority; and to be "entirely independent of all political or sectarian influence." *Id.,* § 9(f). Indeed, the University's powers of organization and government are "subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the university and such competitive bidding procedures as may be made applicable...." *Id.,* § 9(a).

California courts have interpreted Article IX broadly. For example, they have concluded that the University has quasi-judicial powers over its own personnel disputes, and that state courts must show deference when reviewing the factual findings of a University adjudicatory officer. *Ishimatsu v. Regents of the Univ. of Cal.,* 266 Cal.App.2d 854, 864, 72 Cal.Rptr. 756 (Ct.App.1968); *Apte v. Regents of the Univ. of Cal.,* 198 Cal.App.3d 1084, 1091, 244 Cal.Rptr. 312 (Ct.App.1988). The University also has legislative powers in the sense that its policies and procedures attain "the status of statutes in its internal governance." *Apte,* 198 Cal.App.3d at 1092. In addition, the University can use the power of eminent domain as necessary in the service of its other powers. Cal.Educ.Code §§ 92040, 92431. Thus, the University appears to have all of the adjudicative, legislative, and other public powers that the state can grant to an agency.

As a state agency, the University's property and finances are, at least in form, extensions of those of the state. All of the University's property remains property of the state, *In re Bacon,* 240 Cal.App.2d 34, 47, 49 Cal. Rptr. 322 (Ct.App.1966), and the state provides a substantial portion of the University's operating budget. In 1991, this portion amounted to $2.3 billion, or 33% of the University's budget. The other major sources of University funds were the University teaching hospitals ($1.5 billion, 21%), and the federal government ($1 billion, 15%). (Univ. of Calif. Fin. Rep., 1990–1991, Def.'s Br., Ex.

A.) However, the major source of funds for the CSRG, the group responsible for the development and release of Net2, was neither the University nor the state. The CSRG apparently received most of its funds by submitting grant proposals for funding from outside sources. (Pl.'s Opp'g Br., Ex. A.)

The University has other attributes of a state agency as well. For example, it is exempt from taxation by any state or local authority, Cal.Educ.Code § 92443, and it is exempt from local building codes, regulations, permit fees, and inspection fees for constructing improvements solely for educational purposes. *Regents v. Santa Monica,* 77 Cal.App.3d 130, 136, 143 Cal.Rptr. 276 (Ct.App.1978).

In sum, the University has the status of a constitutional branch and independent agency of the state of California, and it has all of the powers and rights attendant to that status.

## II. PROCEDURAL HISTORY

Plaintiff filed its complaint in this action on April 20, 1992. On April 29, the parties agreed to a court-ordered stipulation that BSDI would cease using the phone number "1–800–ITS–UNIX." Plaintiff did not name the University as a defendant until July 24, 1992, when Plaintiff amended its complaint to assert claims against "certain named individuals in their collective capacity as The Regents of the University of California."

Even though the University came late to this action as a formal party, as an informal participant it has been active from the beginning. Indeed, two of the University's attorneys participated so actively in an early deposition that Plaintiff sought sanctions against them. (Pl.'s Opp'g Br. at Ex. D.) The magistrate judge denied the sanctions, but he did permit Plaintiff to retake the deposition without interference from the University attorneys. (Pl.'s Opp'g Br. at 3 n. 1.)

On the same date that Plaintiff filed its first amended complaint, I denied Defendants' motions to dismiss Counts Ten and Eleven. Defendants answered the complaint on September 3 and counterclaimed for declarations of noninfringement, unenforceability, and invalidity of Plaintiff's trademark and copyrights in the UNIX name and materials. Plaintiff replied on September 25, and subsequently moved for a preliminary injunction against BSDI and for a second amendment of the complaint. The University continued its active participation by opposing Plaintiff's motion for a preliminary injunction with voluminous amicus materials addressing numerous issues of law and fact, many of which coincided with elements of Plaintiff's claims against the University. (Pl.'s Opp'g Br. at 5–6.) The University cross-moved to strike pleadings, to dismiss for lack of capacity to be sued, to dismiss for improper venue, to dismiss for lack of personal jurisdiction, and to transfer venue. I denied all of these motions except Plaintiff's motion to amend.

Plaintiff then brought Rule 59(a) and 52(b) motions by order to show cause. I issued an opinion amending certain findings of fact pursuant to Rule 52(b), but I denied Plaintiff's request for a new hearing pursuant to Rule 59(a). The University's present motion to dismiss followed. It moves to dismiss all of the counts of the complaint as against the Regents, and four of the five counts as against the University. The five counts at issue here are:

**Count 1: Breach of Contract.** The University knowingly breached its licensing agreements to use 32V by distributing, disclosing, and using proprietary software in violation of the terms of the agreements. The University acted under the authority of the Regents, who had cause to know of the breach.

**Count 3: Copyright Infringement.** The University and BSDI violated Plaintiff's copyright in its Unix source code by reproducing, distributing, and preparing derivative works of Plaintiff's source code. The University acted under the authority of the Regents, who had cause to know of the violations.

**Count 4: Misappropriation of Trade Secrets.** The University and BSDI misappropriated Plaintiff's trade secrets in violation of state law. The University acted under the authority of the Regents, who had cause to know of the misappropriation.

**Count 6: Trademark.** The University's June 28, 1991 announcement, that its Net2 software is "available to anyone and requires no previous license, either from AT & T or The Regents of the University of California," was materially false and misleading in violation of the Lanham Act. The University acted under the authority of the Regents, who had cause to know of the violation.

**Count 8: Trademark.** The University, in promotional materials and its notice of copyright, misrepresented that the source code in Net2 originated within the University, rather than with AT & T or Plaintiff. The University acted under the authority of the Regents, who had cause to know of the misrepresentation.

## III. DISCUSSION

Defendants advance four arguments in this motion to dismiss. First, they argue that all of the counts, to one degree or another, must be dismissed as against the University because the University benefits from the State of California's immunity under the Eleventh Amendment. Second, they argue that counts 3, 6, and 8 must be dismissed because the Second Amended Complaint contains no allegations of unlawful acts in the time periods when such acts were unprotected by the Eleventh Amendment. Third, they argue that counts 1 and 4 must be dismissed as against the Regents because there is no federal cause of action under *Ex Parte Young* for these violations of state law. Fourth,

they argue that counts 3, 6, and 8 must be dismissed as against the Regents because Plaintiff has an available remedy against the University. Each of these arguments will be discussed in turn below.

### A. Counts 1, 3, 4, 6, And 8 Against The University

Defendants move to dismiss Plaintiff's claims against the University under the Eleventh Amendment. Plaintiff counters this motion with two arguments: first, that the University is not immune; and second, that even if the University is immune, it has waived its immunity.

■■■ Defendants have styled this motion as a motion to dismiss, but they have not otherwise identified the nature of the motion. Since Defendants are moving to dismiss on the basis of Eleventh Amendment immunity, Defendants' motion must be one for lack of subject matter jurisdiction.[2]

■■■ A party can attack subject matter jurisdiction in one of two ways: by a facial attack or by a factual attack. Once a party has attacked subject matter jurisdiction in either of these ways, the party asserting jurisdiction bears the burden of proof. The simplest form of attack, the facial attack, occurs when the moving party challenges the allegations in the pleadings as insufficient on their face. The court must assume that the allegations of the pleadings are true, and then evaluate whether these allegations can

2. The Eleventh Amendment is a jurisdictional bar that prevents a federal court from reaching the merits of a cause of action. *In re New York*, 256 U.S. 490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057 (1921) ("the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a state without consent given"); 12 JAMES W. MOORE, HELEN I. BENDIX, BRETT A. RINGLE, MOORE'S FEDERAL PRACTICE ¶ 300.03[3.–5] (1993). Because the Eleventh Amendment is a jurisdictional bar, it can be raised at any time during the adjudicative process and on appeal. *Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974) (Eleventh Amendment immunity "sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court").

The Eleventh Amendment is somewhat different from other limits on subject matter jurisdiction, in that a party protected by the Eleventh

Amendment can waive immunity. *In re New York*, 256 U.S. at 497, 41 S.Ct. at 589. Nonetheless, the proper vehicle for challenging jurisdiction under the Eleventh Amendment is a motion to dismiss for lack of subject matter jurisdiction. *See Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir.) (reversing on the merits two lower courts' dismissals for lack of subject matter jurisdiction under Eleventh Amendment), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989); *America Bank & Trust Co. of Opelousas v. Dent*, 982 F.2d 917, 920–21 (5th Cir.1993) (reversing on the merits the lower court's dismissal for lack of subject matter jurisdiction under Eleventh Amendment). In this regard, the Eleventh Amendment is similar to the federal doctrine of sovereign immunity, which must also be raised by a motion to dismiss for lack of subject matter jurisdiction. 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 at 195–96 (1990).

support subject matter jurisdiction. 2A JAMES W. MOORE & JO D. LUCAS, MOORE'S FEDERAL PRACTICE ¶ 12.07[2.–1] at 12–46, 12–47 (1993).

■ The second form of attack, the factual attack, occurs when the moving party challenges the jurisdictional facts themselves. Once the jurisdictional facts have been challenged, the court may receive evidence from all parties and "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen v. First Federal Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977) (discussing a Rule 12(b)(1) factual attack on jurisdiction); *see also Nuclear Engineering Co. v. Scott*, 660 F.2d 241 (7th Cir.1981) (once defendant attacks jurisdiction, plaintiff must support jurisdiction with competent evidence), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). The pleader's allegations are not ignored, but "argumentative inferences favorable to the pleader will not be drawn." 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 (1990).

In arguing the present motion, neither party has limited themselves to the pleadings. Both parties have submitted additional materials and argued this motion as if it were a factual attack on jurisdiction. I will do the same.

■ The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This provision divests the federal courts of the power to entertain a suit brought by a private party against a state unless either the state consents or Congress authorizes the action. *Pennsylvania v. Union Gas*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989); *Ford Motor Co. v. Dept. of Treasury of Indiana*, 323 U.S. 459, 462, 65 S.Ct. 347, 349, 89 L.Ed. 389 (1944); *Hans v. Louisiana*, 134 U.S. 1, 15, 10 S.Ct. 504, 507, 33 L.Ed. 842 (1840) (the Eleventh Amendment éven bars suits against a state brought by citizens of that state).

■ The Eleventh Amendment bars suits not only against the state itself, but also against a subdivision of the state if the state remains "the real party in interest." *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974); 13 FEDERAL PRACTICE AND PROCEDURE § 3524 at 140–145 (Eleventh Amendment protects subdivisions of states such as penal institutions, highway departments, courts, most universities, and bar associations). The state is the real party in interest whenever " 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' " *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 908 n. 11, 79 L.Ed.2d 67 (1984) (quoting *Dugan v. Rank*, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)).

■ The Third Circuit has developed a nine-part test to guide the evaluation of a defendant's entitlement to Eleventh Amendment immunity.[3] *Urbano v. Bd. of Manag-*

---

3. The nine factors are:

[L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations. *Urbano*, 415 F.2d at 250–51.

One of these criteria, the "governmental or proprietary function" criterion, is no longer valid. The Supreme Court rejected this criterion in a different context in *Garcia v. San Antonio Met-*

*ers of N.J. State Prison,* 415 F.2d 247, 250–51 (3d Cir.1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970). For clarity's sake, the Third Circuit has consolidated these factors into three groups:

(1) Whether the money that would pay the judgment would come from the state (this includes three of the Urbano factors—whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);

(2) The status of the agency under state law (this includes four factors—how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and

(3) What degree of autonomy the agency has.

*Fitchik v. N.J. Transit Rail Operations, Inc.,* 873 F.2d 655, 659 (3d Cir.), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989).

■ The threshold issue is whether either Congress or the State of California have abrogated Eleventh Amendment immunity with respect to the causes of action in counts 1, 3, 4, 6, and 8. With respect to the state-law counts 1 and 4, the answer is no.[4] However, with respect to the copyright count 3, and the trademark counts 6 and 8, the answer is partly yes, partly no.

Under the copyright laws as they existed prior to 1990, states enjoyed immunity under the Eleventh Amendment. *Richard Anderson Photography v. Radford Univ.,* 852 F.2d 114 (4th Cir.1988); *Woelffer v. Happy States of America,* 626 F.Supp. 499, 504 (N.D.Ill.1985). Congress has now changed the copyright laws to eliminate Eleventh Amendment immunity for violations on or after November 15, 1990. 17 U.S.C. § 511(a) (added 1990) (abrogating Eleventh Amendment immunity); Copyright Remedy Clarification Act, 104 Stat. 2749, 2750 (1990) ("[t]he amendments made by the Act shall take effect with respect to violations that occur on or after the date of the enactment of this Act. Approved November 15, 1990").

Similarly, under the trademark laws as they existed prior to 1992, states also enjoyed Eleventh Amendment immunity. *Woelffer,* 626 F.Supp. at 504. Congress has now changed these laws as well, to eliminate immunity for violations on or after October 27, 1992. 15 U.S.C. § 1114(1) (added 1992) (providing remedies for violations by state defendants); 15 U.S.C. § 1122 (added 1992) (abrogating Eleventh Amendment immunity); Trademark Remedy Clarification Act, 106 Stat. 3567, 3568 (1992) ("[t]he amendments made by this Act shall take effect with respect to violations that occur on or after the date of the enactment of this Act. Approved October 27, 1992"). Thus, the state of California is at least partially immune from suit in federal court under each of counts 3, 6, and 8.

This is not the first time that this district has examined whether the state of California's immunity extends to the University. *See Ciba–Geigy Corp. v. Alza Corp.,* 804 F.Supp. 614 (D.N.J.1992). In *Ciba–Geigy,* the court balanced the *Fitchik* factors to find that the State of California was, in fact, the real party in interest in a suit against the University. In an exhaustive opinion, the court found that the factors favoring Eleventh Amendment immunity were, in broad outline: (i) the University's status as a state agency, along with the attendant immunities and privileges, *id.* at 622–23; (ii) the state's influence over the University, as manifested by the state's role in prescribing procedures for competitive bidding, in requiring regular personnel reports, and in placing state officials and appointees as Regents, *id.* at 623–

---

*ro. Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), and the Third Circuit no longer considers this factor germane to Eleventh Amendment analysis. *Fitchik v. N.J. Transit Rail Operations, Inc.,* 873 F.2d 655 (3d Cir.1989).

4. To the extent that count 4 alleges a taking without just compensation, Defendants' Eleventh Amendment immunity is somewhat problematic. As a practical matter, however, it is irrelevant whether Defendants are immune from the takings claim because, as discussed in the next section, the takings claim is not ripe.

24; and (iii) the state's control over the University's finances and liability for its debts, *id.* at 624. The factors weighing against immunity were less substantial, including (i) the state's share of the University's budget (only about 33%) and (ii) the University's insurance against certain litigation risks.

The *Ciba–Geigy* court assessed these various factors primarily by analyzing the constitution, statutes, and case law of California. To the degree that factual matters entered into its assessment, these factual matters tended to work against immunity. For example, the court noted that the University relied on outside funding for the greatest part of its budget, with the state supplying only 33%. (This funding rate remains the same in the present action.)

The discussion in *Ciba–Geigy* is complete, well-reasoned and, for the most part, directly applicable to the present case. I will accept its rationale. Accordingly, unless Plaintiff can distinguish the present case from *Ciba–Geigy,* or prove that the University has waived its immunity, I shall grant Defendants' motion to dismiss.

Plaintiff attempts to distinguish this case from *Ciba–Geigy* by drawing attention to the source of funding of the CSRG, the group that oversaw the development and release of Net2. Plaintiff argues that, because the CSRG funded itself through grant proposals and certain commercial activities, the University cannot claim Eleventh Amendment immunity. In essence, Plaintiff appears to be arguing that the CSRG, separated from the remainder of the University, would not be entitled to immunity under the Eleventh Amendment. Perhaps not—but Plaintiff has sued the University as a whole, not the CSRG as a separate entity. Accordingly, Plaintiff must argue that the CSRG's funding through grants and other activities undercuts the immunity of the entire University.

To test this argument, it is necessary to examine how the CSRG's funding fits into the Third Circuit's criteria listed above. The funding is irrelevant to the first group of *Fitchik* factors, since these factors relate to who would bear the cost of any judgment against the University. The funding has somewhat more relevance to the second

group of factors, all of which relate to the University's status as an institution under state law. If the University, by permitting the CSRG to receive outside funding, has exceeded its constitutional and statutory role as an arm of the state, then the CSRG's funding would weigh against immunity under the Eleventh Amendment. But the University has not exceeded its role as an arm of the state in permitting the CSRG to receive outside funding. The University's statutory mandate is to "be the primary state-supported academic agency for research," Cal. Educ.Code § 66010.4(d), and it is well-known that much or most university research is funded through outside grants. By the same logic, the CSRG's funding is not determinative of the third factor, the University's autonomy. Even if the CSRG is autonomous in terms of outside funding, the CSRG remains as much a part of the University as the University's other research groups.

Significantly, the CSRG's funding is irrelevant to the findings at the heart of the opinion in *Ciba–Geigy:*

> [the University's] elevated status as a "fourth branch of government" under the California Constitution, the fact that California has not detached itself from the Regents debts, and the fact that [the Regents'] membership consists overwhelmingly of governmental officials or people chosen by the Governor upon the consent and advice of the Senate.

804 F.Supp. at 625.

Since the facts here are similar to those in *Ciba–Geigy,* and the logic of *Ciba–Geigy* is sound, I will reach the same result. I conclude that, in the absence of a waiver, the University shares the Eleventh Amendment immunity of California. This conclusion is consonant with the holdings of the many other federal courts that have examined this issue. *See Hamilton v. Regents of the University of California,* 293 U.S. 245, 257, 55 S.Ct. 197, 202, 79 L.Ed. 343 (1934); *BV Engineering v. University of California, Los Angeles,* 858 F.2d 1394, 1395 (9th Cir.1988), *cert. denied,* 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 859 (1989); *Thompson v. Los Angeles,* 885 F.2d 1439, 1442–43 (9th Cir.

1989); *Armstrong v. Meyers,* 964 F.2d 948, 949–950 (9th Cir.1992); (*see also* Defs.'s Supp'g Br. at 12 n. 9).

█ Plaintiff's final argument against immunity is that the University has now waived any immunity that it might once have had. Plaintiff relies primarily on *Cobb Coin Co., Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel,* 549 F.Supp. 540 (S.D.Fla. 1982). In *Cobb Coin,* the plaintiff filed an *in rem* complaint to resolve its rights to the defendant sunken ship. The State of Florida intervened, and filed an answer and counterclaim for a declaratory judgment of ownership. Less than a month later, the state moved to enjoin the plaintiff from developing the site, and then proceeded with vigorous motion practice and discovery. The state later moved to dismiss its counterclaim and, after the court granted the motion, moved to dismiss the complaint pursuant to the Eleventh Amendment. The court denied the motion, finding that the State, through its voluntary entry and active participation in the litigation, had waived its immunity.

The other cases cited by Plaintiff are similar: they all involve actions in which the state acted as an affirmative participant rather than as a beleaguered defendant.[5] *See, e.g. Vecchione v. Wohlgemuth,* 558 F.2d 150 (3d Cir.) (defendant waived Eleventh Amendment immunity by entering into consent decree without subsequent appeal), *cert. denied,* 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977); *Garrity v. Sununu,* 752 F.2d 727 (1984) (defendant who lost at trial, and then largely complied with the resulting judgment decree, waived Eleventh Amendment immunity as defense against attorneys fees); *Paul N. Howard Co. v. Puerto Rico Aqueduct Sewer Authority,* 744 F.2d 880 (1st Cir.1984) (defendant who filed counterclaim and third-party complaint waived Eleventh Amendment immunity), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985); *Newfield House v. Mass. Dep't of Publ. Welfare,* 651 F.2d 32 (1st Cir.) (defendant who sought removal arguing that Eleventh Amendment did not bar federal jurisdiction, and who filed counterclaim, waived Eleventh Amendment immunity), *cert. denied,* 454 U.S. 1114, 102 S.Ct. 690, 70 L.Ed.2d 653 (1981).

In the present case, the University has not acted as an affirmative participant. The University has not counterclaimed, filed a third-party complaint, removed to federal court, or even answered. Of course, the University has not been silent—it has moved to dismiss and strike pleadings because the individual Regents originally named in the caption lacked the capacity to be sued; it has moved to dismiss for lack of personal jurisdiction over the University of California; and it has moved to dismiss or transfer for inconvenient or improper venue. But these motions do not create a waiver. Even if I dismiss the state law counts against the University, it may remain a defendant in the federal counts for which Congress has abrogated immunity under the Eleventh Amendment. As such, it is entitled to defend itself as earnestly as any other defendant, and to

---

5. Some of the cases cited by Plaintiff—even recent ones—propose that "it has long been established that a general appearance may constitute ... a waiver" of Eleventh Amendment immunity. *Paul N. Howard Co.,* 744 F.2d 880, 886 (1st Cir.1984), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985); *see also Newfield House, Inc. v. Massachusetts Dept. of Publ. Welfare,* 651 F.2d 32, 36 n. 3 (1st Cir.), *cert. denied,* 454 U.S. 1114, 102 S.Ct. 690, 70 L.Ed.2d 653 (1981). As authority for this proposition, these cases cite *Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 883, 27 L.Ed. 780 (1883). In *Clark,* the Supreme Court upheld jurisdiction over a state that had intervened to claim a fund paid into the court. The Court noted that had the state been a defendant from the beginning, and had the state's only action been a special appearance to protest jurisdiction, then the state would

have retained its full immunity under the Eleventh Amendment.

The Federal Rules of Civil Procedure have eliminated the dichotomy between special appearances and general appearances. Now, a party can join its jurisdictional defenses into a motion with other defenses, or even into its answer and counterclaim. *Neifeld v. Steinberg,* 438 F.2d 423, 428–29 (3d Cir.1971). Accordingly, it makes little sense to continue to distinguish between general and special appearances in Eleventh Amendment jurisprudence. In all other respects, *Clark* seems perfectly compatible with my decision here. In *Clark,* the state waived its immunity because it entered the action voluntarily to seek affirmative relief. Here, the state entered the action involuntarily, and it has sought only to exit as quickly as possible for reasons unrelated to the merits.

do so with all of the weapons in the arsenal of the Federal Rules of Civil Procedure.

Similarly, I find that the aggressive behavior of the University's counsel during the McKusick deposition is not sufficient to establish that the University has waived its immunity by affirmatively seeking relief in federal court. The University has, as yet, sought no relief other than to escape from this case without litigating it on the merits.

Accordingly, I shall dismiss counts 1 and 4 against the University; I shall dismiss count 3 against the University to the extent that it states a claim for violations before November 15, 1990; and I shall dismiss counts 6 and 8 against the University to the extent that they state claims for violations before October 27, 1992.

### B. Failure To Allege Unlawful Acts In Counts 3, 6, And 8

Defendants next contend that Plaintiff has failed to allege that the University committed any wrongful acts after it lost its Eleventh Amendment immunity under the copyright and trademark laws.

■ With respect to the copyright claim in count 3, I find that Plaintiff has alleged facts sufficient to state a cause of action. Plaintiff roots count 3 at least in part in the University's distribution of Net2 software, a distribution covered by the allegations in paragraph 38: "[o]n or about June 28, 1991, the University—at the behest of BSDI's founders—commenced the distribution by CSRG of the Net2 software." (2d Am. Compl. at ¶ 38.) Since the June 28, 1991 distribution occurred after the University lost its Eleventh Amendment immunity from the copyright laws, I will grant Defendants' motion to dismiss count 3 only to the extent that it states a claim against the University for violations before November 15, 1990.

■ With respect to the trademark claims in counts 6 and 8, however, the situation is less clear. Plaintiff has drawn count 6 quite narrowly, apparently to cover a single wrongful act: "[t]he University's June 28, 1991 announcement that its Net2 software is 'available to anyone and requires no previous license, either from AT & T or The Regents of the University of California' is materially false and misleading...." (2d Am.Compl. at ¶ 87.) Since this wrongful act occurred before Congress' elimination of Eleventh Amendment immunity, I find that count 6 fails to state a cause of action against the University.

■ Count 8 is less narrow than count 6. In count 8, Plaintiff alleges that "[s]tatements made by the University in promotional materials, and the copyright notice affixed by the University to its Net2 software, falsely represent or imply that the source code embodied in the Net2 software originates with CSRG, and not with AT & T or USL." (2d Am.Compl. at ¶ 101.) It is not clear when the University distributed the promotional materials referred to in this count, but to the extent that Plaintiff is alleging acts after October 27, 1992, this count states a claim against the University under the Lanham Act.

In summary, I find that counts 3 and 8 contain allegations that the University committed wrongful acts after it lost its immunity under the Eleventh Amendment. Count 6 does not, and it shall be dismissed in its entirety.

### C. Counts 1 And 4 Against The Regents

Counts 1 and 4 state causes of action for breach of contract and misappropriation of trade secrets, respectively. Plaintiff brings these counts pursuant to the legal fiction adopted by Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), to avoid the jurisdictional bar of Eleventh Amendment immunity.

Ex parte Young grew out of a series of lawsuits brought by railroad stockholders to enjoin the implementation and enforcement of certain state laws regulating railroad carriage rates. Edward Young, the state attorney general, argued that the suits were barred under the Eleventh Amendment. The Supreme Court disagreed, offering the syllogism that (i) the Eleventh Amendment only barred suits against those acting under state authority, and (ii) a state lacked the power to authorize an unconstitutional act, hence (iii) the Eleventh Amendment did not

bar suits against those acting in violation of the constitution.

In the years since *Ex parte Young*, the Supreme Court has refined its holding several times. In 1974, the Court took a significant step by limiting the relief available against a state official to prospective injunctive relief only, exactly the relief sought in *Ex parte Young*. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Ten years later, the Court took another significant step and limited the grounds for relief to federal causes of action: "[w]e conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). It is this latter decision that Defendants invoke in their motion to dismiss counts 1 and 4.

Counts 1 and 4, on their face, allege state law causes of action against state officials, and it appears that they must fail under *Pennhurst*. However, in its opposing brief, Plaintiff now argues for the first time that count 4 in fact contains two grounds: a state-law ground for misappropriation, and a federal ground alleging an unlawful taking without just compensation. U.S. CONST. amends. V, XIV. Accordingly, it is necessary to examine count 4 to see if it does, in fact, state a federal takings claim.

In interpreting the allegations of a complaint, a court is not limited to the legal theories named in the complaint. Rather, "'the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory.'" *O'Boyle v. Jiffy Lube Int'l, Inc.*, 866 F.2d 88, 93 (3d Cir.1989) (quoting 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (1969)). "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome." *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80. As long as pleadings "discharge the function of giving the opposing party fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved," the pleadings have served their

purpose. In other words, if Plaintiff has alleged sufficient facts to state a takings claim in count 4, then it is irrelevant that Plaintiff has styled this count as a state misappropriation claim.

As an initial matter, even if Plaintiff has stated a takings claim, there is some question as to whether the Eleventh Amendment bars a just compensation claim from federal court. *Ex parte Young* only allows a party to bring an action for injunctive relief against a state, and the fifth amendment, on its face, requires only compensatory relief: "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V; *see Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984) ("[e]quitable relief is not available to enjoin an alleged taking of private property ... when a suit for compensation can be brought"). In other words, it appears that the compensation required by the fifth amendment might not be available under *Ex parte Young*.

At least one court has adopted this line of reasoning, holding that the Eleventh Amendment bars monetary relief for just compensation against a state in federal court. *Chavous v. South Carolina Coastal Council*, 745 F.Supp. 1168 (D.S.C.1990), *vacated as moot sub nom. Esposito v. South Carolina Coastal Council*, 939 F.2d 165 (4th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992). But other courts have questioned this reasoning, and even the *Chavous* court might reason differently were the just compensation issue to arise again. The Fourth Circuit vacated *Chavous* on other grounds, but the dissent attacked the district court's reasoning as contrary to the spirit of the Supreme Court's opinion in *First English Evangelical Lutheran Church v. Los Angeles Cty.*, 482 U.S. 304, 317, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250 (1987). The dissent remarked that if the district court were correct, then the "[Takings] Clause could be converted from a fundamental constitutional right into an empty admonition." *Esposito*, 939 F.2d at 173 n. 3 (Hall, J., dissenting).

Accordingly, I will assume that the Eleventh Amendment does not bar any takings claims that Plaintiff has asserted against the

Regents, whether for injunctive relief or for just compensation.

■ To state a takings claim, Plaintiff must prove that (i) private property (ii) has been taken for (iii) public use (iv) without just compensation. The first of these requirements is satisfied because trade secrets are property rights under state law. *Monsanto,* 467 U.S. at 1012, 104 S.Ct. at 2878 (Congress cannot preempt state rights against public disclosure of proprietary data); *N.J. State Chamber of Commerce v. Hughey,* 600 F.Supp. 606 (D.N.J.), *rev'd in part on other grounds,* 774 F.2d 587 (3d Cir.1985). The second and third requirements are satisfied because Plaintiff has sufficiently alleged that its property rights have been taken by the Regents.

■ The fourth requirement, the denial of just compensation, is more problematic, and I have uncovered no cases directly on point. However, by analogy to takings cases brought against the United States, I find that Plaintiff cannot bring a takings claim against a state official in federal court until Plaintiff has sought just compensation in state court assuming, of course, that California has the legal machinery necessary for Plaintiff to recover such compensation.

The analogous takings cases against the United States are those cases in which a party has applied for injunctive relief against a federal takings without just compensation. The Supreme Court has routinely held that, in such circumstances, the taking claim is not ripe until after the plaintiff has applied for compensation from the Court of Federal Claims under the Tucker Act. *See, e.g., Preseault v. I.C.C.,* 494 U.S. 1, 11–12, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990) ("takings claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act"); *Monsanto,* 467 U.S. at 1016–1017, 104 S.Ct. at 2880 (equitable relief is premature if plaintiff has a remedy under the Tucker Act); *Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 697 n. 18, 69 S.Ct. 1457, 1465 n. 18, 93 L.Ed. 1628 (1949) (sovereign immunity bars a takings claim for specific relief in district court if a remedy exists under the Tucker Act); *Hurley v. Kincaid,*

285 U.S. 95, 104, 52 S.Ct. 267, 269, 76 L.Ed. 637 (1932) (equitable relief is unavailable if plaintiff has a remedy under the Tucker Act).

The Tucker Act has two operative sections, 28 U.S.C. §§ 1346 & 1491. The first of these sections grants jurisdiction to the district courts over certain claims against the United States for $10,000 or less:

> The district courts shall have original jurisdiction, concurrent with the United States Claims Court, of: ... (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort....

28 U.S.C. § 1346(a). The second section grants jurisdiction to the Court of Federal Claims over these claims regardless of amount:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). In addition, the jurisdiction of the Court of Federal Claims includes limited equitable and declaratory powers:

> To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief.

28 U.S.C. § 1491(a)(3).

Thus, in the case of a takings claim against the United States, the Court of Federal Claims and district courts have concurrent jurisdiction over claims up to $10,000, and the Court of Federal Claims has exclusive

jurisdiction on claims beyond that amount. However, if a plaintiff wishes injunctive relief, the plaintiff must ordinarily bring suit in federal district court. Because of this jurisdictional structure, federal takings cases usually reach district court as suits for declaratory and injunctive relief. The district courts, but not the Court of Federal Claims, can grant this relief, whereas the Court of Federal Claims, but not the district court, can grant relief for compensatory damages over $10,000.

One such federal takings case is *Monsanto*. In *Monsanto*, the appellee Monsanto sought to protect its trade secrets from disclosure under the reporting requirements of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* Monsanto argued that the disclosure requirements of FIFRA were unconstitutional because, among other things, they took Monsanto's trade secrets without just compensation. The district court agreed, and declared the relevant provisions of FIFRA to be unconstitutional.

The appellants in *Monsanto* appealed the district court's decision directly to the Supreme Court, where the Court held that the district court had erred in even reaching the takings claim. The court explained its holding as follows:

> Because we hold that the Tucker Act is available as a remedy for any uncompensated taking Monsanto may suffer as a result of the operation of the challenged provisions of FIFRA, we conclude that Monsanto's challenges to the constitutionality of the arbitration and compensation scheme are not ripe for our resolution. Because of the availability of the Tucker Act, Monsanto's ability to obtain just compensation does not depend solely on the validity of the statutory compensation scheme.[6]

467 U.S. at 1019, 104 S.Ct. at 2881. In other words, Monsanto's complaint was not properly before the district court because Monsanto had failed to seek just compensation first.

Another instructive case is *Security Sav. Bank v. Director, Office of Thrift Supervision*, 798 F.Supp. 1067 (D.N.J.1992) (Gerry, C.J.). In this case, the plaintiff Security Savings Bank sued the Office of Thrift Supervision ("OTS") for declaratory and injunctive relief on its breach of contract and takings claims. The court dismissed the suit for lack of subject matter jurisdiction, because the Court of Federal Claims had exclusive jurisdiction of the suit under the Tucker Act. The court suggested several different rationales for its conclusion, one of which is particularly appropriate here:

> The Tucker Act's jurisdiction over takings claims is thus made exclusive by the nature of the constitutional guarantee itself. Where just compensation is available, a taking is not unconstitutional; the availability of just compensation under the Tucker Act in the Claims Court therefore vitiates the need for any other relief in any other court.

798 F.Supp. at 1072.

It is conceivable that the reasoning behind *Security Savings, Monsanto,* and the other federal takings cases might not apply here because, as noted above, these cases involved takings claims against the federal government for injunctive relief, not takings claims against state governments for just compensation. But the Supreme Court has expanded the scope of the federal takings cases by relying on them in analyzing takings claims against the state for just compensation. A pertinent example of such a case is *Williamson Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

In *Williamson*, appellees brought suit in district court for just compensation against a

6. Under FIFRA, a pesticide manufacturer must register its pesticides with the Environmental Protection Agency ("EPA") before selling the pesticides in interstate or international commerce. *See generally* 7 U.S.C. § 136a. In its application for registration, the manufacturer must include various test data demonstrating the safety and efficacy of its product. Once the manufacturer has submitted this test data, however, it loses its control over the data. The EPA can disclose certain portions of the data to other applicants for use in registration applications so long as the other applicants agree to compensate the manufacturer who originally developed the data. 7 U.S.C. § 136a(c)(1)(F).

regional planning commission, alleging that the commission had taken property through the application of various zoning laws and regulations. The jury found for appellees in the sum of $350,000, which the court then rejected in a judgment for appellants notwithstanding the verdict. Appellees appealed successfully to the court of appeals, but the Supreme Court reversed the court of appeals and remanded the case as premature.

The Supreme Court held that before a takings claim was ripe, the planning commission must have reached a final decision on compensation to the appellee. The onus of obtaining this decision was not on the commission, however, but rather on the appellee. Among other things, the appellee must have submitted alternative plans, sought variances, and brought suit for inverse condemnation before the denial of compensation would become final. 473 U.S. at 187–91, 196, 105 S.Ct. at 3117–19, 3121–22.

The Supreme Court resolved *Williamson* using the same principles that it used for federal takings cases such as *Monsanto*. Indeed, the Supreme Court cited *Monsanto* itself for the proposition that "[i]f the [state] government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking." *Williamson Planning Comm'n*, 473 U.S. at 194, 105 S.Ct. at 3121 (citing *Monsanto*, 467 U.S. at 1013, 1018, n. 21, 104 S.Ct. at 2881).

 In sum, the federal takings cases and *Williamson* teach that a plaintiff cannot bring a takings claim in federal district court, whether for injunctive relief or damages, until the plaintiff has sought and been denied just compensation. This bar against federal takings relief is more than a jurisdictional bar under the Tucker Act; until a plaintiff has sought just compensation, there is no case or controversy. "Where just compensa-

tion is available, a taking is not unconstitutional." *Security Sav. Bank*, 798 F.Supp. at 1072. Thus, until a plaintiff has availed itself of a state's "adequate process for obtaining compensation," the plaintiff has suffered no harm and has no federal cause of action.

One key assumption of all of these holdings is that the plaintiff can, indeed, receive just compensation under the Tucker Act. If " 'compensation under the Tucker Act is unavailable or inadequate, the plaintiff is entitled to equitable relief even in a United States District Court.' " *Carteret Sav. Bank v. Office of Thrift Supervision*, 963 F.2d 567, 582–83 (3d Cir.1992) (quoting *Carteret Sav. Bank FA v. Office of Thrift Supervision*, 762 F.Supp. 1159, 1179 (D.N.J.1991), *vacated*, 963 F.2d 567 (3d Cir.1992)). However, courts generally find that compensatory damages are adequate except in the most dire of cases. For example, compensatory damages are adequate even when a plaintiff faces "takings resulting in significant losses of business, including the closing down of a business." 963 F.2d at 584 (citing *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974)); *Security Savings*, 798 F.Supp. at 1072–73, n. 7 (finding no jurisdiction over claim for equitable relief because plaintiff alleged only that, without equitable relief, it would go out of business).

Plaintiff has raised concerns here about the adequacy of state compensation. At oral argument, Plaintiff suggested that California law did not provide for injunctive relief against the University, relief that Plaintiff believes is necessary. Given the strong showing necessary to overcome the presumption in favor of compensation, Plaintiff's concerns are not determinative. Even were Plaintiff to face dissolution as a result of Defendants' acts, compensatory damages would still be the appropriate remedy.

Consequently, I find that Plaintiff must seek just compensation in state court, if possible, before its federal claim is ripe.[7] The Court in *Monsanto* endorsed a similar argu-

---

7. Plaintiff does not claim that its state law remedies are inadequate, e.g. because they do not provide it with due process of the law. Accordingly, I will not reach this issue, although it appears that a post-deprivation state-law tort claim provides all the process that Plaintiff is

due. *See Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (only post-deprivation process is necessary if pre-deprivation process is impractical); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (due process balancing test includes consider-

ment, except that the compensation suit was to be brought in the Court of Federal Claims rather than state court. I find that the present case is sufficiently like *Monsanto* to require the same result: Plaintiff's takings claim will not be ripe until Plaintiff has sought just compensation in state court.[8] Since Plaintiff has no takings claim, counts 1 and 4 must be dismissed as against the Regents.

This result not only conforms with the takings jurisprudence of the Supreme Court, it also conforms with Eleventh Amendment jurisprudence and with common sense. If Plaintiff could bring a takings claim in the present case, then plaintiffs could also bring takings claims every time a state agency breached a contract or committed a tort that deprived a plaintiff of property. In other words, all contract and property claims against state officials would become federal claims within the subject matter jurisdiction of federal courts. 28 U.S.C. § 1331. Federal courts would be forced to do exactly what the Eleventh Amendment would otherwise preclude:

> it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Pennhurst,* 465 U.S. at 106, 104 S.Ct. at 911; *see also Casey v. Depetrillo,* 697. F.2d 22, 23 (1st Cir.1983) (a breach of contract is not a violation of due process, and "[n]o different result is required under the Takings Clause"); *HMCA (Carolina), Inc. v. Soler-Zapata,* 778 F.Supp. 1234, 1239 (D.P.R.1991) ("[t]he takings claim is but an extension of [plaintiff's] allegations of breach of contract, none of which raise a question under the Constitution").

### D. Counts 3, 6, And 8 Against The Regents

Defendants' final argument is that Plaintiff can bring a cause of action under *Ex parte Young* against the Regents only if Plaintiff has no cause of action against the University. Therefore, "[b]ecause there are statutory remedies against the University for any future violations of either the Copyright Act or the Lanham Act, there is no justification for naming the individual Regents as defendants in these claims." (Defs.' Supp'g Br. at 15.)

Defendants cite no cases with holdings that support this argument,[9] justifying it instead as a logical necessity. Defendants' reasoning seems to be as follows: *Ex parte Young* is necessary so that a party can sue a state for injunctive relief in the absence of other remedies against the state; here, Plaintiff has other remedies against the state; so *Ex parte Young* is unnecessary; and therefore, *Ex parte Young* must be unavailable.

Defendants' argument is unpersuasive, especially in the present case. Here, Plaintiff can only state a cause of action against the University for violations occurring after Con-

---

ations of efficiency). Assuming that Plaintiff has no due process claim, "it would be 'surprising indeed to discover' the challenged [acts] nonetheless violat[e] the takings clause." *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.,* ⸺ U.S. ⸺, 113 S.Ct. 2264, 124 L.Ed.2d 539 (U.S. June 14, 1993) (quoting *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986)).

**8.** In *Williamson,* the Supreme Court held that exhaustion of state remedies was not necessary in order to bring a takings claim in federal court. 473 U.S. at 192–93, 105 S.Ct. at 3119–20. Thus, it seems that Plaintiff could return to federal court after an adjudication of its compensation claims at the trial level, without the need for appeal. If Plaintiff does so, it may qualify for an exception from the principles of res judicata. *Fields v. Sarasota Manatee Airport Auth.,* 953 F.2d 1299 (11th Cir.1992).

**9.** Defendants suggest that *Pennhurst,* 465 U.S. at 105, 104 S.Ct. at 910, supports their proposition that *Ex parte Young* is necessarily only an *alternative* to direct claims against the state. The cited page appears to support a somewhat different proposition, namely that *Ex parte Young* is a limited circumvention of the Eleventh Amendment "necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.' " *Pennhurst,* 465 U.S. at 105, 104 S.Ct. at 910 (quoting *Ex parte Young,* 209 U.S. at 160, 28 S.Ct. at 454). The limitation in *Pennhurst* is not on the nature of the actions available under *Ex parte Young,* but rather on the nature of the relief.

gress' waiver of Eleventh Amendment immunity. By comparison, Plaintiff can state a cause of action against the Regents for any act within the limitations period. Thus, it is conceivable that Plaintiff could succeed in its claims against the Regents yet fail against the University. However, even if Plaintiff's claims were duplicative, there is no rule of federal law that requires a party to pare redundant claims from a complaint. *See* FED.R.CIV.P. 8(a)(3) ("[r]elief in the alternative or of several different types may be demanded"); *see also* FED.R.CIV.P. 8(e) ("[a] party may also state as many separate claims or defenses as the party has"). As a practical matter, of course, it may make little difference whether Plaintiff names the University or the Regents as defendants in its efforts to obtain injunctive relief.

Accordingly, Defendants' motion to dismiss claims 3, 6, and 8 against the Regents is denied.

## IV. CONCLUSIONS

I will grant Defendants' motion to dismiss count 1 in its entirety; count 3 against the University to the extent that it states a cause of action for acts prior to November 15, 1990; count 4 against the Regents and the University; count 6 against the University; and count 8 against the University to the extent that it states a cause of action for acts prior to October 27, 1992. An appropriate order shall issue.